**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Mahesh Reinholdson, a minor
by his parent, Jan Simon,

                    Plaintiff,

                                                    **MEMORANDUM OPINION**
          v.                                         **AND ORDER**
                                                     Civil No. 02-4225 ADM/AJB
School Board of Independent
School District No. 11,

                    Defendant.

_____

Sonja D. Kerr, Esq., Kerr Law Office, Anchorage, AK, and Judith A. Gran, Esq., Public Interest
Law Center of Philadelphia, Philadelphia, PA, on behalf of Plaintiff.

Charles E. Long, Esq., Kennedy & Graven, Minneapolis, MN, and Timothy R. Palmatier, Esq.,
Palmatier Law Office, Minneapolis, MN on behalf of Defendant.

_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge on Mahesh

Reinholdson ("Student"), a minor, by his parent, Jan Simon's ("Parent") (collectively,

"Plaintiff") Motion for Judgment on the Record [Docket No. 24] and School Board of

Independent School District No. 11's ("District") Motion for Judgment as a Matter of Law

[Docket No. 20].  Plaintiff seeks review and reversal of a decision issued by a second-tier

Hearing Review Officer ("HRO"), pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400-1487 (2000).  For the reasons set forth below, Defendant's Motion

for Judgment on the Administrative Record is granted.

## II.  BACKGROUND

### A.  The IDEA

The IDEA requires a school district that accepts federal funds to provide disabled children within its jurisdiction a "free appropriate public education" ("FAPE").  20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A).  To provide a FAPE, a school must formulate an individualized education plan ("IEP") tailored to the disabled child's unique needs.  See id. § 1400(d)(1)(A).  The school district must also provide extended school year ("ESY") services if the child's IEP team determines, on an individual basis, the services are necessary to provide a FAPE to the child.  Id. § 300.309(a)(2).

Parents who are dissatisfied with the substance or implementation of their child's IEP may request a state administrative due process hearing before an independent hearing officer ("IHO").  See 20 U.S.C. § 1415(f); Minn. Stat. § 125A.09 (2002).  During the time period relevant to this matter, Minnesota employed a two-tier administrative process wherein the IHO's decision was first appealed to an HRO.  See Minn. Stat. § 125A.09, subd. 6-7 (repealed May 2003).  The HRO's decision could then be appealed to either federal district court or the state court of appeals.  See id., subd. 9 (repealed May 2003).[1]

### B.  Factual Background

Mahesh Reinholdson, is a disabled student who suffers from Cerebral Palsy, attention hyper-deficit disorder and speech, language and cognitive defects.  Ex. 3.[2]  Defendant does not

---

[1]  As of 2003, a party's appeal from an IHO's decision is directly reviewed by either federal district court or the state court of appeals.  See Minn. Stat. § 125A.091, subd. 24 (Supp. 2004).

[2]  All exhibit numbers refer to exhibits submitted by the parties as part of the due process hearing presided over by the Independent Hearing Officer ("IHO).  Documents designated as

contest the Student is entitled to receive special education services, including ESY, under a category of mild moderate impairment ("MMI"), pursuant to the IDEA and corresponding state law.

In Spring 2000, when the Student was twelve years old, he completed fifth grade at Andover Elementary School ("Andover"). Ex. 4. The following Fall, he began sixth grade at Roosevelt Middle School ("Roosevelt"). Id. District staff and the Parent met on April 13, 2000, May 10, 2000 and September 7, 2000 to discuss ways to ease this transition. Tr. at 33-34, 36-38, 232; Ex. 5. Although topics such as how services and classes should be modified to accommodate the Student's specific needs were discussed, the meetings largely focused on the Parent's request that the Student continue to be provided one-to-one paraprofessional support in the upcoming school year. Tr. at 34, 38-40, 66, 68-69. The Student had been receiving one-to-one paraprofessional support in fifth grade and the parent strongly advocated he continue to receive such support upon entering the sixth grade. Tr. at 39-40, 588-89, 714. The Student began the school year with one-to-one paraprofessional support, although members of his IEP team began to monitor the Student's ability to stay on task when the level of paraprofessional support was varied. Tr. at 39-40, 67-68, 662, 713.

On November 15, 2000, the Parent and the rest of the IEP team met to determine the Student's needs and develop a new IEP. Tr. at 125. Although the team attempted to discuss the Student's present levels of performance, educational needs and appropriate programming, the critical issue for the Parent was whether the Student would receive one-to-one paraprofessional support. Tr. at 129, 663-67, 669. The Parent also requested the District use the "Reading

_____

IHO Ex. No. are included in the IHO's procedural file.

Mastery" program instead of the "Read Naturally" program and asked for curriculum outlines, textbooks, test materials and teaching materials to determine their appropriateness.  Tr. at 129-31.  In a November 22, 2000 letter, the District concluded, <u>inter alia</u>, based on data submitted by the Parent and collected at the school, that the Student did not require one-to-one paraprofessional support.  Ex. 34.

On December 1, 2000, a Notice of Proposed Special Education Services, which included a proposed IEP, was provided to the Parent.  Tr. at 205-07; Exs. 22, 40  The Parent rejected the IEP proposal on December 14, 2000.  Ex. 22.

On January 30, 2001, the Parent and District staff met to review materials for sixth grade reading, art and health classes.  Exs. 13, 40 at 28-33; Tr. at 681.  The Parent did not object when told the Student would no longer be taught using the "Reading Mastery" program.  Tr. at 137.

On January 8, 2001, the Parent notified the District that she wished to proceed with a conciliation conference.  Ex. 40 at 42.  The parties were unable to resolve their differences through conciliation.  <u>See</u> Ex. 40 at 22.  Because of the dispute, no IEP was produced for the Student during the 2000-2001 school year.  As a result, the Student continued to receive services under his 1999-2000 IEP, the "stay put" IEP.  Tr. at 70, Ex. 7.

## C.    Procedural Background

On February 28, 2001, the District requested a due process hearing to determine whether the December 2000 proposed IEP provided sufficient paraprofessional support and provided the Student with a FAPE "as written or with minor modifications."  District Request for Hearing (Palmatier Aff. [Docket No. 22] Ex. A).

On March 23, 2001, the Parent, on behalf of the Student, requested a separate due

4

process hearing as to whether the District, during the 2000-2001 school year: (1) properly implemented the Student's stay put IEP of November 1999; (2) failed to develop the Student's ESY program in a timely manner; (3) failed to provide appropriate reading curriculum and regular education modifications and accommodations; (4) proposed an IEP with defective goals and objectives; and (5) failed to provide "a planned program of supplementary aides and services in the regular education environment." Parent's Request for Hearing (Palmatier Aff. Ex. B).

On May 8, 2001, the hearing requests were consolidated. The hearings, known as MDCFL Case Nos. 420 & 427, took place on May 8, 9, 10, 11, and 16, 2001 and involved testimony from 16 persons. See Findings of Fact, Conclusions and Decision ("IHO Decision") (Palmatier Aff. Ex. C) at 1-2. On June 4, 2001, the IHO issued her decision finding: (1) the proposed IEP provided the Student with appropriate paraprofessional services and (2) the District did not violate the "stay put" IEP. Id. at 29-30. The IHO also denied the Student's requests to: (1) order a specific method of instruction be included in the IEP; (2) modify the Student's program of supplementary aides and services; and (3) determine appropriate ESY services. Id. at 29-30. The IHO did find the December 1, 2000 proposed IEP was incomplete and required modification:

> Absent agreement by the Parent and District regarding the proposed IEP or a new IEP within the next seven calendar days, the IHO orders the District to modify the proposed IEP to reflect the following changes by June 11, 2001.
>
> A. Include in all objectives or benchmarks the anticipated performance level and number of trials required for success. The use of "teacher observation" is appropriate, but the percentage of performance needs specification: For example: Mary will . . . with 70% accuracy, as measured by teacher performance on 3 of 5 trials documented per week, once every other week; etc.
>
> B. Provide the types and levels for prompts that apply to each objective as outlined (IE., verbal, physical and verbal, physical).

C.  Specify the level and number of trials used in data collection where the objective specifies the criteria "of that time."

D.  Delete information in the Present Level of Performance sections that does not reflect performance for the goal area.  Include current progress data based on the Student's performance as of May 2001.

The Parent, upon receipt of the proposed IEP as modified to reflect the decision in this matter, is to review the new draft IEP.  If the Parent objects to any goals, objectives or modifications proposed by the District in response to this order, the Parent must identify same in writing and provide suggestions for edits or changes to the District by June 25, 2001.  If disagreement remains between the District and Parent following receipt and review of the Parent's requested modifications, the District is to convene the IEP team to discuss and resolve the remaining IEP issues.  The IEP team is ordered to use a trained, "neutral" facilitator to assist the parties in resolving remaining issues.  The parties are to identify issues and at least one solution per issue and provide this information to the neutral facilitator prior to the team meeting for distribution to the team members.  The exchange of issues and suggested resolve among the parties previous to the IEP team meeting may assist the team in developing the Student's IEP expeditiously.

Id.  Given these modifications, the IHO found the proposed IEP provided the Student with a

FAPE and denied the Student's request for compensatory education.  Id. at 30.

The Student subsequently appealed myriad issues in the IHO Decision to an HRO.  See

Findings of Fact, Conclusions, and Decision ("HRO Decision") (Palmatier Aff. Ex. D).  On

August 21, 2001, the HRO affirmed all of the IHO's Decision except the requirement that the

Parent and District work with a neutral facilitator to further develop the Student's IEP.  Id. at 6-

7.  The HRO found such direction violated 34 C.F.R. § 300.511(a)(1)'s requirement that a

hearing officer who presides over a due process hearing issue a final decision.  Id. at 2.

Consequently, the HRO struck the last paragraph of the above-quoted IHO Decision.  Id.

On March 27, 2002, the District requested another due process hearing because the

District and the Parent disagreed as to the proper manner for re-evaluating the Student.  The

parties ultimately resolved the dispute before the due process hearing was held.  Dismissal Order

(Complaint [Docket No. 1] Ex. D).

On April 15, 2002, Plaintiff filed the present claims as part of <u>Reinholdson, et al. v. State of Minnesota, et al.</u>, Civil Case No. 02-795, which asserted various class-wide IDEA violations against the District.  This Court denied the <u>Reinholdson</u> plaintiffs' motion to certify a class and ruled that each plaintiff's individual case should be severed and refiled as separate actions.  <u>See</u> 2002 U.S. Dist LEXIS 17169 (D. Minn. Sept. 9, 2002).  Plaintiff refiled the claims in the instant action.  On October 7, 2003, Magistrate Judge Raymond L. Erickson denied Plaintiff's Motion to Supplement the Administrative Record [Docket No. 15].

Plaintiff's claims can be divided into four general areas.  First, Plaintiff asserts the IEP does not meet the substantive requirements set forth by the IDEA.  Second, Plaintiff claims the structure of the due process hearing resulted in procedural error by denying Plaintiff a full and fair evidentiary hearing on the merits.  Third, Plaintiff raises, for the first time, several issues related to the proposed IEP before this Court.  Finally, Plaintiff raises several issues concerning events that occurred after the due process hearing concluded concerning the appropriateness of the education provided to the Student.  Defendant argues several of these issues are moot since the Student no longer attends school in the District.

### III.  DISCUSSION

**A.**     **Standard of Review**

In a motion for judgment on the record brought pursuant to the IDEA, a district court must review the state administrative record, hear additional evidence if requested, and grant such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(B); <u>CJN ex rel. SKN v. Minneapolis Pub. Sch.</u>, 323 F.3d 630, 636 (8th Cir. 2003).

"Although a district court should independently determine whether the child has received a

FAPE, it must give 'due weight' to agency decision-making." <u>CJN</u>, 323 F.3d at 636.  The

"IDEA does not require that a school either maximize a student's potential or provide the best

possible education at public expense." <u>Fort Zumwalt Sch. Dist. v. Clynes</u>, 119 F.3d 607, 612

(8th Cir. 1997).  Rather, a school district satisfies its obligations under the IDEA if: (1) it

complies with the Act's procedural requirements and (2) the IEP is "reasonably calculated to

enable the child to receive educational benefits." <u>Bd. of Educ. of the Hendrick Hudson Cent.</u>

<u>Sch. Dist. v. Rowley</u>, 458 U.S. 176, 206-07 (1982).

**B.    Mootness**

Before the beginning of the 2004-2005 school year, the Student withdrew from

Independent School District No. 11 and enrolled in White Bear Lake Area Schools ("ISD No.

624").  Plaintiff continued to reside in Independent School District No. 11.  Simon Aff. [Docket

No. 29] ¶ 2.  As a result, the District argues Plaintiff's requests for prospective relief are moot.

<u>See</u> <u>Neshaminy Sch. Dist. v. Karla B.</u>, 25 IDELR 725 (D. Penn. 1997) (finding student's request

for prospective relief was moot because Student had moved to, and enrolled in, another school

district).  Plaintiff argues the evidence of the Student's enrollment in ISD No. 624 should not be

considered because it was provided after a deadline was imposed to supplement the Record.

Regardless, Plaintiff argues the claims are capable of repetition but evading review because the

Student still resides in the District.  Furthermore, Plaintiff argues the Eighth Circuit has held the

claims of a student requesting a due process hearing <u>before</u> enrolling in a new school district are

not moot.  <u>Indep. Sch. Dist. No. 284 v. A.C.</u>, 258 F.3d 769 (8th Cir. 2001); <u>see also</u> <u>M.P. v.</u>

<u>Indep. Sch. Dist. No. 721</u>, 326 F.3d 975 (8th Cir. 2003), <u>reh'g den'd</u> 2003 U.S. App. LEXIS

13504 (8th Cir. July 3, 2003).

Although the Student did not enroll in ISD No. 624 until after the deadline for supplementing the Record, the constitutional requirement that a case or controversy not be moot requires the Court to consider this information.  See McCarthy v. Ozark Sch. Dist., 359 F.3d 1029, 1035 (8th Cir. 2004) ("Under Article III of the Constitution, federal courts 'may adjudicate only actual ongoing cases or controversies'").  The Court will also consider the Parent's affidavit averring the Student enrolled in ISD No. 624 only because Defendant was not providing him with a FAPE.  Simon Aff. ¶ 3.

The Eighth Circuit has clearly stated challenges to a student's IDEA do not become moot if made before a student changes school districts.  Indep. Sch. Dist. No. 284, 326 F.3d at 774-75; see also Thompson v. Bd. of the Special Sch. Dist. No. 1, 144 F.3d 574, 579 (8th Cir. 1998).  Once a student has enrolled in a new school district, the former school district is no longer responsible for providing the Student with a FAPE; however, if the student continues to reside in the former school district, it is responsible for assuming the cost of providing the student with a FAPE.  Minn. R. 3525.0800, subp. 8.  Therefore, a student who requests a due process hearing but subsequently enrolls in another district is only entitled to compensatory remedies.  Indep. Sch. Dist. No. 284, 326 F.3d at 774-75.  Because the former school district is no longer responsible for "assuring that an appropriate program is available for the pupil including the notice and hearing provision," the change in circumstances renders the need for prospective relief moot.  Id.; Neshaminy Sch. Dist., 25 IDELR 725; Thompson, 144 F.3d at 574.

Plaintiff argues, since the Student still resides in the District, that this case is "capable of repetition but evading review" and any prospective claims are not moot.  Honig v. Doe, 484 U.S.

305, 319-23 (1988).  The Court rejects this argument.  First, the responsibility for providing the

Student with a FAPE now lies with the new school district in which he is enrolled.  Minn. R.

3525.080, subp. 8.  Consequently, any prospective relief this Court might fashion would not be

applied as the Student is not enrolled in the Defendant District.  See Neshaminy Sch. Dist., 25

IDELR 725 ("None of the aforementioned statutory obligations fall upon [the former school

district] at this point in time").  Furthermore, were the Student to reenroll in the District, nothing

would prevent Plaintiff from using all of the IDEA's safeguards, including due process hearings,

to ensure the Student receives an appropriate IDEA.  The IDEA would require the District to

develop an individually tailored IEP, based on current levels of performance and including

appropriate objectives and benchmarks, that provided the Student with a FAPE.  Since an IEP

must be current, and the Student has spent an entire school year in another district, such a

process is best accomplished at the time, if ever, the Student reenrolls in the District.  Therefore,

there is no evidence that Plaintiff's claims for prospective relief "evade review."

Nonetheless, it is undisputed that Plaintiff requested a due process hearing before

enrolling in ISD No. 624.  Therefore, the instant suit is not entirely moot and Plaintiff may

pursue compensatory claims.

**C.     Compliance with IDEA's Substantive Requirements**

A student's IEP is substantively appropriate if it is individually tailored and consistent

with the student's needs and "reasonably calculated to enable the child to receive educational

benefits."  Rowley, 458 U.S. at 206-07.  A student's IEP does not need to maximize a student's

potential or provide the best possible education.  Fort Zumwalt Sch. Dist., 119 F.3d at 612.  It

need only ensure the student receives "meaningful benefit" from his education.  Ridgewood Bd.

of Educ. v. NE, 30 IDELR 41 (3d Cir. 1999).  It does require that a student's IEP team use their

best efforts to create an individualized plan for the student.  34 C.F.R. §§ 300.344, 300.346,

300.347.

Plaintiff argues the District failed to comply with the IDEA's substantive requirements.

Plaintiff asserts the following substantive violations: (1) by providing less than one-to-one

paraprofessional support, the District failed to implement the stay put IEP; (2) the Student

requires one-to-one paraprofessional support to receive a FAPE; (3) the ESY program set forth

by the District was deficient; and (4) the proposed IEP does not provide the Student with a

FAPE.  Plaintiff also raised several additional issues on appeal, including: (1) the

paraprofessionals were inadequately trained; (2) the proposed IEP was developed outside the

process required by the IDEA; and (3) the Student's regular education staff and the Parent were

not involved in developing the IEP.  Each of these concerns will be addressed in turn.

## 1.     Paraprofessional Support Required by the Stay Put IEP and Necessary to Provide a FAPE

Plaintiff claims the District violated the Student's stay put IEP when it provided Student

with less than one-to-one paraprofessional service.  Under the IDEA's stay put provision, a

student involved in a pending due process hearing remains in his current educational placement

unless the school and the parents agree otherwise.  See 20 U.S.C. § 1415; 34 C.F.R. § 300.514.

Because the parties could not agree to an IEP for the Student during the 2000-2001 school year,

the Student's last agreed upon IEP was for the 1999-2000 school year ("1999 IEP").  Plaintiff

claims the 1999 IEP furnished the Student with one-to-one paraprofessional support.  As a result,

providing the Student with anything less than one-to-one paraprofessional support would violate

his stay put IEP.  Plaintiff also believes the Student requires one-to-one paraprofessional support

to provide a FAPE.  As these concerns are related, they will be addressed together.

The 1999 IEP provides the Student with 1800 minutes of paraprofessional time.  Ex. 7.
The IEP states, "the Special Education paraprofessional will work with [the Student] throughout
the school day, both in the Special Education rooms as well as in the mainstream classroom."  Id.
The Appendix sets forth the responsibilities of the special education paraprofessional.  Id.  It
notes, "The Special Education paraprofessional will assist [the Student] in all settings throughout
the school day including: mainstream classes, SPED setting, and Special areas."  Id.  The
Appendix also lists myriad specific responsibilities of the paraprofessional.  Id.  The IEP does
not state the required paraprofessional support must be on a "one-to-one" basis.  The Parent
believed the Student was receiving one-to-one paraprofessional support at Andover Elementary.
Tr. at 729-30.  The Parent testified that, given the support and the Student's success at Andover,
she believed one-to-one paraprofessional service was required by the stay put IEP.  Tr. at 656-
57, 667; IHO Ex. 13.

The Court finds the 1999 IEP did not require one-to-one paraprofessional service for the
Student.  The IEP merely mandates the paraprofessional "assist [the Student] in all settings
throughout the school day."  Ex. 7.  Nothing precludes a District from providing more services
than required by an IEP.  However, the District must provide the minimum services required by
the stay put IEP.  Provided the District furnished the Student with sufficient paraprofessional
support to assist the Student in all settings throughout the school day, the District could
permissibly provide the Student with less than one-to-one paraprofessional support without
violating the IDEA.  Ultimately, the paraprofessional support furnished to the Student is
sufficient if it provided him with a FAPE.

12

Judy Trepanier, the Student's primary IEP manager at Andover, testified the Student did not receive one-to-one services from an exclusive paraprofessional while in the fifth grade. Tr. at 603. She believed the Student's tendency towards dependence on adults militates against providing the Student with an exclusive one-to-one paraprofessional. Tr. at 606-07. Likewise, the Student's fifth grade paraprofessional confirmed that, while she assisted in all areas of the educational setting, she was not assigned exclusively to the Student. Tr. at 457. She testified that one goal was to get the Student to become less dependent on his paraprofessional. Tr. at 459-62. She "backed off" to allow the student an opportunity to help himself and noted the Student successfully responded to less paraprofessional assistance by seeking cues from the environment and his peers. Tr. at 459-62.

On August 7, 2000, the Student underwent an independent educational evaluation ("IEE") from Dr. Nancy Wagner, a licensed psychologist at Gillette Children's Hospital. Ex. 3. Dr. Wagner found the Student had achieved qualitative gains in his ability to work independently on tasks, write neater, and understand a task more quickly. Id. She also found the Student demonstrated overall improvement in the quality of his work, as measured subjectively by adults in his environment. Tr. at 755-56, 759-61 766-67. Dr. Wagner concluded the Student would continue to make academic progress but at a rate consistent with his cognitive abilities and dependent upon his attention and organizational skills. Tr. at 745-48, 755-56, 759-61, 766-67, 770; Ex. 3.

Dr. Wagner also assessed the Student's need for paraprofessional support. She concluded the Student required paraprofessional support to learn new skills, but his need for one-to-one paraprofessional support is dependent upon the task. Tr. at 749-51, 778-80, 797-99. She

also noted the Student's Parent and teachers indicated that the Student can become significantly dependent on the aid of adults in completing and organizing his work or in initiating social activities.  Tr. at 758; Ex. 3.  The Parent also expressed concern to District staff that the Student was overly dependent on his paraprofessional.  Tr. at 35-36.

The Record indicates the Parent understood the District would provide the Student with one-to-one paraprofessional services in Fall 2000 while compiling data to determine whether continued one-to-one support was necessary.  Tr. at 35-36, 38-40, 66-67, 253, 659, 713; Ex. 3, 4, 5, 38.  Throughout the year, the Student continued to have a paraprofessional available throughout the day to assist him, however, the staffing ratio varied between one-to-one, one-to-two and one-to-three.  Tr. at 434, 827-28, 830-32, 525-27, 541-42, 575-76, 580,186-87, 350-51, 365-66, 382-85, 390-91, 394-95, 434-35, 661-62.  The District documented the time and paraprofessional working with the Student on a schedule posted in the classroom.  Tr. at 228-30, 237, 261-62.  Paraprofessionals chart the Student's performance on tasks completed in the resource room.  Tr. at 511-14, 534, 542.

In October and November 2000 and in March 2001, Brenda Erickson ("Erickson"), the Special Education Teacher and Case Manager at Roosevelt, assessed the Student's performance relative to paraprofessional support by observing the Student in intervals between 20 and 40 minutes.  Tr. at 181-90.  Erickson charted the Student's on task behavior, as compared to the on task behavior of his peers in the same setting, to compare his attentiveness when he received variable levels of paraprofessional support.  Tr. at 187-90, 192, 197, 262-68, 317-20; Exs. 20, 21. The Student's level of attention did not decrease when he received less than one-to-one paraprofessional support.  Tr. at 189-90; Exs. 20, 21.  Instead, his attentiveness remained

14

comparable to his peers regardless of the level of paraprofessional assistance.  Tr. at 189-90; Exs. 20, 21.  Based on these observations, coupled with discussions with the Parent, interactions with the Student, review of the Student's IEP and current educational status, and communications with District staff, Erickson believes the Student requires a full time paraprofessional in the academic setting but does not require a one-to-one paraprofessional.  Tr. at 251-55, 306-07.  Erickson testified the support of a paraprofessional who provides continual prompts and redirection prevents the Student from improving his self-sufficiency and trial and error problem solving.  Tr. at 306-07.

The Student's ability to independently follow directions in multi-step tasks improved between September 2000 and March 2001, when his paraprofessional support level changed from one-to-one to one-to-two or one-to-three.  In September 2000, the Student required verbal prompts to complete 11 of 13 steps in a pictured step by step recipe.  Tr. at 336-38, 340-42; Ex. 11.  The Student's performance on similar tasks improved throughout the school year.  Ex. 11.  In March 2001, the Student only required verbal prompts to complete four of twelve steps for a similar recipe.  Tr. at 336-38, 340-42; Ex. 11.

Erickson's observations, quantitative performance and the testimony of the Student's teachers and paraprofessionals indicate the Student is making progress towards becoming more independent and does not require one-to-one paraprofessional support.  Tr. at 126-28, 220-21, 306-07; Exs. 20-21.  Lynette Ostendorf and Justine Hunt, who both served as the Student's sixth grade paraprofessionals also testified the Student did not require one-to-one paraprofessional support.  Tr. at 475-76, 827-28, 830-32.

Finally, the Student himself has told paraprofessionals at both Andover and Roosevelt that he does not need their assistance when working in groups or when completing certain tasks. Tr. at 495-96, 827-28, 830-32.  The paraprofessionals nevertheless remain nearby to provide aid if required.  Tr. at 830-32.

The instant situation is similar to the matter of Conecuh County Sch. Bd., where parents requested a due process hearing when the District refused to provide the student with a one-to-one personal aide.  27 IDELR 112 (SEA Ala. 1997).  The IHO found the student was receiving meaningful educational benefit without the assistance of a one-to-one personal aide.  The evidence indicated the student "benefitted from socializing with students her own age, and the district's decision was consistent with the IDEA's preference for mainstreaming."  Id. Furthermore, the IHO held the "continued assistance of a personal aide would have prevented the student from becoming independent and self-sufficient."  Id.  The IHO noted the student would have access to a personal aide when necessary.  Id.

Similarly, the preponderance of the evidence in the instant case indicates the Student does not require full time one-to-one paraprofessional assistance to receive a FAPE.  The quantitative, qualitative, and anecdotal evidence in the Record demonstrates the Student is making meaningful educational progress with variable paraprofessional support.  The Student has access to paraprofessional assistance at all times throughout the day, with a one-to-two or one-to-three level of support.  In addition, variable paraprofessional support is in keeping with the IDEA's mandate of providing students with education in the least restrictive environment. See 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.550; Minn. R. 3525.0400; Tr. at 221.  Furthermore, variable paraprofessional support will assist the Student in becoming more independent and self-

sufficient, goals identified by Dr. Wagner, the Parent, and the Student's educators.  Nothing in

the Student's IEP explicitly requires full time one-to-one paraprofessional assistance, provided

the Student continues to have access to paraprofessional assistance at all times throughout the

day.  Since the Student continues to receive meaningful educational benefit with variable levels

of paraprofessional support, the District did not violate the Student's 1999 stay put IEP by

offering one-to-two and one-to-three paraprofessional services.  For the same reason, the

variable paraprofessional support services recommended by the District in the proposed IEP do

not deny the Student a FAPE.

### 2.    ESY Services

Plaintiff contends the District violated the IDEA when it did not specify ESY services for

the Student in the December 2000 IEP.  Plaintiff asserts that the District's practice of creating

ESY programs in the spring results in an incomplete IEP and eliminates the students' ability to

challenge the program in a timely due process hearing.  Consequently, Plaintiff claims both the

IHO and HRO erred in finding it was "premature" to determine at the due process hearing if the

ESY program proposed for the Student was deficient.

The purpose of ESY is to maintain performance on the student's IEP goals and to prevent

the significant regression students with disabilities often experience in the absence of continuous

educational programming.  See Minn. R. 3525.2900, subp. 1(G); 34 C.F.R. § 300.309.  Neither

party contests the Student is eligible for ESY.  The dispute is when the District must define the

ESY services the Student will receive.

The December 2000 IEP states the District would determine at a later date whether the

Student required ESY services.  Despite lack of specificity, it is clear from the District's actions

by the time of the due process hearing, it intended to provide the Student with ESY services. The IEP team attempted to schedule a meeting in early March to discuss ESY but this meeting was canceled by the Parent. Tr. at 211-15, Exs. 23, 40. On March 30, 2001, the IEP team, including the Parent and her counsel, met to discuss ESY services for the Student. Tr. at 212-13, 417-21; Exs. 24, 33. The Parent requested the District make an ESY proposal and stated the meeting could not continue without objective data on the Student's progress. Id. A meeting set for April 19, 2001 to develop an ESY program never occurred. Id. The Parent declined to attend additional ESY meetings because she was concerned her "voice [would] not be heard." See April 27, 2001 E-mail from Simon to Shablow (Ex. 40). After meeting in mid-May, the District proposed an ESY program to the Parent on May 17, 2001. May 17, 2001 Letter from Peterson to Simon (IHO Ex. 40). The Parent rejected the proposal on May 19, 2001. May 19, 2001 E-mail from Simon to Peterson (IHO Ex. 41).

In her pleadings, Plaintiff raised ESY services as an issue for the due process hearing. Although the District proposed an ESY program following the May 16, 2001 completion of the due process hearing, Plaintiff had not provided the District with notice outlining the Student's objections to the proposed program at the time of the hearing. IHO Ex. 41. As a result, the IHO concluded the District had not had an opportunity to cure the Parent's objections. See Indep. Sch. Dist. No. 432 v. J.H., 8 F. Supp. 2d 1166, 1175 (D. Minn. 1998). Plaintiff argues the IHO erred because the ESY proposal should have been completed "in accordance with the child's IEP." See 34 C.F.R. § 300.309(b)(1)(ii). Plaintiff interprets the regulation to mean the ESY proposal must be completed contemporaneously with the other portions of the Student's IEP.

It is well established, however, that neither federal nor state law require a student's IEP

to determine a student's ESY services by a particular date.  The Office of Specific Education

Programs addressed this specific issue when it explained:

> There is no need to specify a timeline for determining whether a child should receive
> ESY services.  Public agencies are expected to ensure that these determinations are made
> in a timely manner so that children with disabilities who require ESY services in order to
> receive FAPE can receive the necessary services.

64 Fed. Reg. 12575, 12577 (March 12, 1999).

The Court finds that the District fully complied with procedural requirements regarding

ESY services.  The purpose of ESY services is to prevent regression and recoupment problems,

rather than advance the educational goals outlined in the student's IEP.  Letter to Myers, 16

EHLR 290 (OSEP Dec. 18, 1989); Tr. at 499.  As a result, the services in the ESY may differ

from those provided during the school year.  The IEP team's decision to defer until Spring the

specifics of the ESY services necessary to help the Student maintain the skills he learned during

the school year was reasonable under the circumstances.

Plaintiff relies on Reusch v. Fountain for the proposition that it is "unacceptable . . . to

make decisions so late in the school year that the disabled child cannot exercise right of review

and/or be given the ESY to which that child was entitled."  872 F. Supp. 1421, 1433 (D. Md.

1994).  However, Reusch concerned a school district that made almost 75% of all decisions on

ESY eligibility, including all denials of ESY eligibility, after May 1.  The District's policy is to

propose an ESY plan for the student by April 1 of the school year.  Here, the District attempted

to schedule a meeting with the Parent to discuss the Student's ESY services in early March.

Although that meeting was canceled by the Parent, the District and Parent did meet on March 30,

2001.  The Parent refused to attend the additional ESY meetings the District attempted to

schedule.  Despite that lack of parental participation, the District properly completed an ESY

19

proposal.  Although, in the instant case, the proposal was not completed until May 17, 2001, there is insufficient evidence before this Court to find the systemic violations at issue in Reusch.[3]

The IDEA requires a district have notice of any objections a parent has to a proposed action and be given an opportunity to respond to the parent's objections before the issue is ripe for a due process hearing.  Indep. Sch. Dist. No. 432, 8 F. Supp.2d 1166, 1175 (D. Minn. 1998). The issue of ESY services was submitted to the IHO before the Parent had fully participated and exhausted the IDEA's administrative process.  Because the Parent had not yet given the District notice of her objections to the ESY proposal or given the District the opportunity to rectify those concerns, the IHO correctly held it was premature to determine the adequacy of the proposed ESY services.

### 3.      Additional Issues

On appeal to the HRO, Plaintiff raised, for the first time, the following additional substantive and procedural issues: (1) the paraprofessionals were inadequately trained; (2) the proposed IEP was developed outside the process mandated by the IDEA; and (3) the District developed the IEP without input from the Parent or the Student's regular education staff.  At the time the due process hearing took place, Minnesota law required the party requesting a hearing to "plead with specificity as to what issues are in dispute and all issues not pleaded with specificity are deemed waived."  Minn. Stat. § 125A.09, subd. 6 (repealed 2003).  The HRO found these issues were not pled with specificity and were waived.  HRO decision at 6.  Plaintiff claims this statute was contrary to the clear language of the IDEA which permits a hearing on

---

[3]On these facts, the Court finds the District determined ESY services in a timely manner. However, the District is urged to complete ESY proposals as early as possible in the school year to provide students and their families some certainty, and to allow time for the IDEA's administrative process to run its course, if necessary.

"any matters" related to identification, evaluation, educational placement or provision of a

FAPE.  See 20 U.S.C. § 1415(b), 34 C.F.R. § 300.507.  Plaintiff argues the burden is on the

District to "prove up" the proposed IEP, so plaintiffs may appropriately raise any aspect of the

IEP they believe deficient.

It is well-established Minn. Stat. § 125A.09, subd. 6 required the parental notice to plead

with specificity issues subject to a due process hearing.  See Independent Sch. Dist. No. 432,

F. Supp. 2d at 1174 (explaining the law requires the parties to precisely frame the issues).  The

statutory requirement is not contrary to the IDEA.  Although the IDEA does permit a parent to

bring a due process hearing on "any matter," the IDEA requires a parent requesting a due

process hearing to provide a "description of the nature of the problem" and a "proposed

resolution of the problem to the extent known and available to the parent at the time."  20 U.S.C.

§ 1415(b)(7)(B).  See also, 34 C.F.R. § 300.507(c)(2) (a parent's notice must include "a

description of the nature of the problem of the child relating to the proposed or refused initiation

or change, including facts relating to the problem . . . .");  [Student] v. ISD No. 11, MDCFL Case

No. 423-2, at *6-7 (SEA 2001) (finding Minn. Stat. § 125A.09's specificity requirement did not

conflict with 34 C.F.R. § 300.507).  Although Minn. Stat. § 125A.09 has since been repealed, it

is undisputed the statute was in effect at the time of the due process hearing.  Consequently, the

IHO did not err by finding Plaintiff waived any issues not pled with specificity.

A review of Plaintiff's Statement of Issues clearly shows Plaintiff never asserted the

District violated the IDEA's procedural requirements in creating the Student's IEP.  Although

the Parent's Statement of Issues challenged the sufficiency of the curriculum, it did not argue the

curriculum had been developed by the District without input from the Parent or the educators

who regularly worked with the Student.  Parent's Request for Hearing at 5.  The IHO found the

Student's proposed reading program acceptable, his regular education curriculum appropriately

modified and the proposed services sufficient.  IHO Decision at 24-25.  Plaintiff did not appeal

this conclusion.   Neither did the Parent raise the adequacy of the paraprofessionals' training as

an issue for the hearing.  The Parent's Statement of Objections did include: "Is [the Student]

entitled to a trained professional to assist him with academic work, including reading, math,

social studies, sciences, etc., rather than simply to respond in 'safety' situations?"  Parent's

Request for Hearing at 4-5.  The Court finds this question posed by Plaintiff did not provide the

District with sufficient notice that the training of the paraprofessional, rather than the level of

support provided, was an identified issue for the hearing.  As a result, the HRO correctly found

these issues were waived.

### 4.      Was the Student Denied a FAPE?

The Parent argues the Student was denied a FAPE because the IHO found the proposed

IEP was "incomplete and required modification."  IHO Decision at 29.  In particular, the IHO

found the objectives and benchmarks for measuring the Student's anticipated performance levels

were inadequate.  Id.  To rectify these shortcomings, the IHO ordered the District to include

certain metrics in the proposed IEP.  Id.  The new version of the proposed IEP was then to be

forwarded to the Parent. Id. at 29-30.  Should the Parent reject the proposed IEP, the IHO

ordered the two parties engage a neutral facilitator to reach a mutually agreeable proposed IEP.

Id. at 30.  Nevertheless, the IHO found, once the objectives and benchmarks were updated, the

proposed IEP would provide the Student with a FAPE.

The HRO found the IHO's decision to permit the Parent to respond to the District's

proposed changes and to engage a facilitator violated 34 C.F.R. § 300.511(a)(1)'s requirement

that a hearing officer presiding over a due process hearing issue a final decision.  As a result, the

HRO modified the IHO's decision by deleting the portion requiring parental agreement or the

use of a neutral facilitator in determining the objectives and benchmarks.  HRO Decision at 6.

Plaintiff argues the IHO and HRO erred in finding the proposed IEP provided the Student with a

FAPE despite the finding that the objectives and benchmarks were inadequate.  Plaintiff also

contends the HRO erred in finding the collaborative portion of the IHO's Order could be

eliminated and still provide the Student with a FAPE.  Plaintiff contends such a directive violates

the IDEA's requirement that an IEP be developed in a collaborative process with parent and

district staff participation.  See 20 U.S.C. § 1414(d).

   A proposed IEP must include a "statement of the child's present levels of educational

performance" and "a statement of annual goals."  20 U.S.C. §§ 1414(d)(1)(A)(i), (ii).  Under the

IDEA, the hearing process is designed to resolve disagreements between the District and the

parents over a proposed IEP in a timely manner.  The IHO recognized the benchmarks and

objectives included in the proposed IEP were inadequate and provided a solution to rectify the

shortcoming.  Use of the hearing process to remedy a deficient IEP and thereby facilitate the

speedy provision of a current IEP for the Student is not error.

   Despite the need for modifications in the IEP's benchmarks and objectives, the IHO

concluded the proposed IEP provided the Student with a FAPE.  Again, as previously stated, the

IDEA does not require that a District maximize a student's potential or provide the best possible

education; however a student's IEP must be "reasonably calculated to enable the child to receive

educational benefits."  Rowley, 458 U.S. at 206-07; Fort Zumwalt Sch. Dist., 119 F.3d at 612.

As detailed below, the preponderance of evidence in the Record supports the finding that the Student was receiving meaningful educational benefit and that the proposed curriculum was appropriate.

District representatives testified the Student's behavior improved throughout the school year.  Erickson found, as the year progressed, the Student's impulsive behavior decreased, he required fewer reminders concerning the volume of his voice or the need to raise his hand, and he exhibited appropriate interactions with peers in the resource room and in mainstream classes. Tr. at 164-65  She also testified the Student's attention span and on task behavior improved.  Tr. at 164-65; see also Tr. at 530.  Similarly, the Student's science teacher, Cheryl Peters, stated the Student's behavior became less impulsive and he became less dependent on his paraprofessional to gather materials needed for class.  Tr. at 348-49.  The Student demonstrated the ability to more independently learn a routine, follow directions and perform activities, including reading. Tr. at 348-49, 368-70, 377.  The Student also demonstrated an improved performance on multi-step tasks between September 2000 and March 2001.  Tr. at 336-38, 340-42; Exs. 10, 11. Furthermore, the Student's paraprofessional support decreased from one-to-one to one-to-two or one-to-three in this period.  Tr. at 336-38, 340-42.

The Student's development in reading also showed improvement.  At Andover, the Student's reading program included the Reading Mastery program, trade books and teacher-developed materials.  Tr. at 599.  Both Trepanier and the Parent believed the Student demonstrated steady reading progress at Andover.  Tr. at 600-01, 677.

At Roosevelt, Christine Hanson, the Student's initial reading teacher, used the Read Naturally curriculum in Fall 2000.  Tr. at 129, 311.  Erickson continued this program when she

24

assumed responsibility for the Student's reading curriculum in February 2001.  Id.  The Student

performed at a second grade level in the Reading Mastery program in Spring 2000 and

performed at a second grade level in the Read Naturally program in Spring 2001.  Tr. at 308-11.

Due to differences in the nature of the programs, the evidence does not suggest the results for

each program are directly comparable.  Tr. at 325-27, 604-06.  At the conciliation conference

preceding the due process hearing, however, the District agreed, in the future, to "provide

information regarding the Read Naturally and Reading Mastery programs, and . . . instruct in

either or both programs at the parents' request."  District Request for Hearing at 3.

Erickson also used the "News for You" with the "Board Maker" program to aid the

Student's reading development.[4]  Tr. at 85-88; Ex. 9.  The Student demonstrated success under

the News for You curriculum, as demonstrated by his performance on weekly worksheets, which

were sent home to the Parent.  Tr. at 98, 101; Ex. 9.  The use of the Board Maker program is

responsive to recommendations in the Student's 2000 IEE suggesting the use of visual methods

and materials with the Student.  Tr. at 115; Ex. 3.  Throughout the Fall of 2000, the Student

required consistent verbal prompts to complete each step of the Board Maker program.  Tr. at

108.  By Spring 2001, the Student required only occasional prompts, understood the format of

the exercises and began checking his own work.  Tr. at 108-11.  The Student exhibited the ability

to comprehend and follow directions in his own reading level and complete the depicted steps.

Tr. at 108-11.

Progress reports, as well as the Student's reading level as determined by the Reading

_____

[4]  The Board Maker program pairs words with pictures and is used in activities requiring
comprehension of sequential directions and steps to facilitate the student's independence and
reading skill comprehension development.  Tr. at 103-06; IHO Decision at 16; Exs. 9-11.

Mastery and Read Naturally programs, indicate varying amounts of progress in reading and

spelling.  Ex. 12; Tr. at 131-32.  This variability is not surprising given Dr. Wagner's assessment

of the Student's abilities.  Dr. Wagner opined the Student would continue to make academic

progress but at a rate consistent with his cognitive abilities and dependent upon his attention and

organizational skills.  Tr. at 745-48, 755-56, 766-67, 770; Ex. 3.  District staff also noted the

Student's performance on the same task differs according to his setting and attentiveness. Tr. at

132.  A preponderance of the evidence in the Record as a whole indicates the Student is

receiving meaningful educational benefit from his curriculum.  Furthermore, the District has

agreed to instruct the Student using the Reading Mastery program if the Parent prefers.  For

reasons already discussed, the level of paraprofessional support contained in the proposed IEP is

also appropriate.  As a result, the proposed IEP, once modified to be consistent with the IHO's

Order, provides the Student with a FAPE and complies with the IDEA.  The District's Request

for Hearing explicitly contemplated the IHO might need to make modifications to the proposed

IEP to provide a FAPE.  Request for Hearing at 4 (asking the IHO for an Order "sustaining the

District's IEP proposal of December 1, 2000 as written, or with minor modification").

Therefore, the IHO did not err by properly exercising authority to modify the proposed IEP and

determining that it provided the Student with a FAPE.

Plaintiff also argues the HRO erred by modifying the IHO's Order to comply with 34

C.F.R. § 300.511(a)(1)'s requirement that a hearing officer presiding over a due process hearing

issue a "final decision" rather than finding the Student was entitled to compensatory education.

Since the IHO's Order directed for a series of actions between the parties following the

decisions, the Order was not final.  Under Minn. Stat. § 125A.09, compensatory education is

only appropriate when a student is denied a FAPE and suffers a loss of educational benefit.

Based upon the preponderance of evidence in the Record, there is no proof the Student suffered a

loss of educational benefit.  Because the proposed IEP would be appropriate once the District

complied with the IHO's mandated modifications, it was appropriate for the HRO to alter the

IHO's Order to ensure a final judgment.

**D.      Post-Hearing Issues**

Paragraphs 27 to 33 of Plaintiff's Complaint raise several issues that arose after the

conclusion of the due process hearing.  Plaintiff claims these issues – the absence of current

performance evaluations, an inadequacy of subsequent written IEPs, failure to provide one-to-

one paraprofessional services, and failure to provide services in the least restrictive environment

– are identical to the issues raised on behalf of the Student during the 2000-2001 school year.

The District argues these issues are not properly before the Court due to Plaintiff's failure to

exhaust administrative remedies.  Plaintiff contends the exhaustion requirement should be

waived for futility.  According to Plaintiff, parents and their counsel are barred, under threat of

sanctions, from litigating identical issues brought in an earlier hearing in a later hearing.

Moubry v. ISD 696, 9 F. Supp. 2d 1086, 1108-09 (D. Minn. 1998) adopted by 951 F. Supp. 867

(D. Minn. 1996).

Plaintiff fundamentally misinterprets Moubry.  Moubry stands for the well-established

principle that a parent is barred from litigating the exact same issue that was the subject of an

earlier due process hearing in a later due process hearing.  Id.  Plaintiff cites no authority for the

proposition that similar contested issues cannot form the basis of a due process hearing when

those issues arise out of the IEP process in a different school year.  The IDEA contains a

27

mandatory requirement that Plaintiff exhaust the administrative process before seeking judicial review.  See 20 U.S.C. § 1415(i)(2) (stating that a party aggrieved by the due process hearing panel's decision has the right to bring a civil action "with respect to the complaint presented"). See also Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 656 (6th Cir. 1999); Moubry, 9 F. Supp. 2d at 1099-1100.  Furthermore, this Court's September 9, 2002 Opinion and Order specifically held, "to the extent any Plaintiff is attempting to bring claims . . . they did not raise in the administrative hearing process, such claims are dismissed." Reinholdson, 2002 U.S. Dist. LEXIS 17169 at *28.  For these reasons, the Court finds Plaintiff's additional claims are dismissed for failure to exhaust administrative remedies.

**E.      Procedural Errors in the Due Process Hearing**

Plaintiff claims the IHO committed procedural errors in structuring the due process hearing.  Specifically, Plaintiff contends the IHO erred by: (1) calling, sua sponte, Dr. Wagner to testify as a witness, and (2) excluding transcripts of IEP meeting tapes.  Each of these issues will be discussed in turn.

**1.      Dr. Wagner**

Plaintiff argues the IHO erred by calling, on her own initiative, Dr. Wagner to testify in the due process hearing.  See IHO Decision at 5.  The Minnesota law in effect at the time of the hearing provided an IHO with broad powers to rule on evidentiary matters and request evidence necessary to the decision:

> The hearing officer shall preside over and conduct the hearing and shall rule on procedural and evidentiary matters . . . one purpose of the hearing is to develop evidence of specific facts concerning the educational needs, current educational performance, or apparent disabilities of the person as it relates to the need for the proposed action. Consistent with the rights and procedures in parts 3525.3300 to 3525.4770, nothing in parts 3525.0200 to 3525.4770 limits the right of the hearing officer to question witnesses

28

or request information.

Minn. R. 3525.4300 (amended 2003).  Furthermore, hearing officers possessed the authority to

"subpoena any person or paper considered necessary for an adequate review of the

appropriateness of the proposed action that is subject of the hearing . . . ."  Minn. R. 3525.4100.

(repealed 2003).

Although Plaintiff acknowledges the authority granted by these regulations, Plaintiff

argues this language presumes a party has requested the witness and only then allows a hearing

officer to question that witness or request information.  Plaintiff offers no authority to support

this position.  Dr. Wagner conducted an IEE of the Student and made conclusions regarding the

Student's disabilities, education progress and curriculum needs.  Exs. 2, 3; IHO Decision at 6.

Clearly, this information is relevant to the scope of the due process hearing.  As a result, the IHO

was within her authority when she asked Dr. Wagner to testify.

## 2. IEP Meeting Transcripts

Plaintiff contends the IHO erred by refusing to admit transcripts of the taped IEP

meetings.  IHO Ex. 43.  Plaintiff argues the evidentiary standard in effect at the time permitted

the introduction of evidence upon which a reasonably prudent person could rely and that the

IHO, a nonlawyer, overstepped her authority by excluding the transcripts.  Minn. Stat. §

125A.09, subd. 19 (repealed 2003).

Minnesota law in effect at the time of the hearing required the IHO to exclude evidence if

it was "incompetent, irrelevant, immaterial, or unduly repetitious."  Id.  After listening to the

tapes, the IHO determined the transcripts contained several errors and were of questionable

accuracy.  Tr. at 645-54.[5]  Plaintiff was not prejudiced by this decision since the meeting tapes themselves were admitted into evidence and admission of the transcripts is cumulative.  Exs. 31, 32, 33.  Consequently, the IHO did not err by excluding the meeting transcripts.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Judgment on the Pleadings and Administrative Record [Docket No. 24] is **DENIED**;

2.  Defendant's Motion for Judgment on the Record/Summary Judgment [Docket No. 20] is **GRANTED;**

3.  Plaintiff's Complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 2, 2005.

_____

[5]  For example, the second paragraph of page two of the transcript of the November 15, 2000 meeting contains two inaccuracies.  See Ex. 43.